**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**NORTHEAST HOSPITAL CORP.,**

      **Plaintiff,**

        **v.**                            **Civil Action No.  09-0180 (JDB)**

**KATHLEEN SEBELIUS,**
**Secretary, United States Department**
**of Health and Human Services,**

      **Defendant.**

---

**MEMORANDUM OPINION**

The Secretary of the Department of Health and Human Services, through the Centers for

Medicare and Medicaid Services ("CMS"), provides Medicare payments to hospitals that serve a

disproportionate share of low income patients.  In this action, Northeast Hospital Corporation

appeals the Secretary's final decision concerning the amount of Medicare payments due to

Beverly Hospital ("the Hospital"), a Massachusetts non-profit hospital, for the 1999-2002 fiscal

years.  Currently before the Court are the Hospital's motion for summary judgment and the

Secretary's cross-motion for summary judgment, on which the Court heard oral argument on

February 19, 2010.  Upon consideration of the relevant legal authorities, the parties' memoranda,

and the entire record herein, and for the reasons discussed below, the Court will grant in part and

deny in part both the Hospital's and the Secretary's motions, will vacate the Secretary's final

decision, and will remand to the Secretary for further proceedings.

**BACKGROUND**

Through a complex statutory and regulatory regime, the Medicare program reimburses

qualifying hospitals for services they provide to eligible elderly and disabled patients.  See generally County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999).  Medicare reimburses the "operating costs of inpatient hospital services" under a prospective payment system -- that is, based on prospectively-determined standardized rates -- subject to hospital-specific adjustments.  See 42 U.S.C. § 1395ww(d); In re Medicare Reimbursement Litig., 309 F. Supp. 2d 89, 92 (D.D.C. 2004), aff'd, 414 F.3d 7, 8-9 (D.C. Cir. 2005).  One such adjustment is the "disproportionate share hospital" ("DSH") adjustment, by which the Secretary provides an additional payment to hospitals that "serve[] a significantly disproportionate number of low-income patients."  42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

Whether a hospital qualifies for a Medicare DSH adjustment, and the amount of the adjustment it receives, depends on the hospital's "disproportionate patient percentage."  See id. § 1395ww(d)(5)(F)(v)-(vii).  This percentage is a "proxy measure for low income."  See H.R. Rep. No. 99-241, at 16 (1985), reprinted in 1986 U.S.C.C.A.N. 579, 594.  It represents the sum of two fractions, commonly referred to as the "Medicaid fraction" and the "Medicare fraction."  See 42 U.S.C. § 1395ww(d)(5)(F)(vi); Jewish Hosp. Inc. v. Sec'y of Health and Human Servs., 19 F.3d 270, 272 (6th Cir. 1994).

The Medicaid fraction, central to this case, is defined as

the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a [s]tate [Medicaid] plan . . . , but who were not entitled to benefits under [Medicare] part A . . . , and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  Thus, the Medicaid fraction varies based on a hospital's

patient days attributable to individuals who were eligible for medical assistance under a state

Medicaid plan but not entitled to benefits under Medicare part A.[1]  "Put simply, the more a

hospital treats patients who are 'eligible for medical assistance under a State plan approved under

[Medicaid],' the more money it receives for each patient covered by Medicare."  Adena Reg'l

Med. Ctr. v. Leavitt, 527 F.3d 176, 178 (D.C. Cir. 2008) (quoting 42 U.S.C. §

1395ww(d)(5)(F)(vi)(II)) (alteration in original).

      The Medicare fraction, which is less directly relevant here, is

> the fraction (expressed as a percentage), the numerator of which is the number of
> such hospital's patient days for such period which were made up of patients who
> (for such days) were entitled to benefits under [Medicare] part A . . . and were
> entitled to supplemental security income benefits . . . , and the denominator of
> which is the number of such hospital's patient days for such period which were
> made up of patients who (for such days) were entitled to benefits under
> [Medicare] part A . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  Thus, the Medicare fraction turns on the number of a

hospital's patient days attributable to individuals entitled to benefits under Medicare part A as

well as supplemental security income benefits.

      Medicare DSH payments are initially calculated by a "fiscal intermediary" -- typically an

insurance company acting as the Secretary's agent.  See 42 C.F.R. §§ 421.1, 421.3, 421.100-.128.

The fiscal intermediary applies the Medicare fraction as computed by CMS.  See id. §

412.106(b)(2), (5).  But the intermediary (rather than CMS) calculates the Medicaid fraction

based on data submitted by the medical care provider.  See id. §§ 412.106(b)(4), 413.20.  The

fiscal intermediary then adds the two fractions to determine the Medicare DSH reimbursement

---

[1] The Medicare program is divided into several parts.  Medicare part A covers medical
services furnished by hospitals and other institutional providers.  See 42 U.S.C. §§ 1395c-1395i-
5.

due, which it sets forth in a Notice of Program Reimbursement.  See id. § 405.1803.

A provider dissatisfied with the fiscal intermediary's determination may request a hearing before the Provider Reimbursement Review Board ("PRRB"), an administrative body appointed by the Secretary.  See 42 U.S.C. § 1395oo(a), (h).  The Board may affirm, modify, or reverse the fiscal intermediary's award.  Once the Board rules, the Secretary may affirm, modify, or reverse the Board's decision.  See id. § 1395oo(d)-(f).  The Secretary has authorized the Administrator of CMS to act on her behalf in reviewing the Board's decisions, and the Administrator's review of a Board ruling is considered the final decision of the Secretary.  See 42 C.F.R. § 405.1875.  Providers may then challenge the Secretary's final determination in federal district court.  See 42 U.S.C. § 1395oo(f).

In this case, the Hospital received a Medicare DSH payment for each of the 1999 through 2002 fiscal years.  The Hospital challenged the amount of these payments before the PRRB, contending that the fiscal intermediary improperly excluded patient days attributable to three different groups -- patients receiving charity care, patients enrolled in so-called "Medicare+Choice" plans, and patients receiving labor and delivery room services -- from the numerator of its Medicaid fraction, and that CMS incorrectly calculated its Medicare fraction.  The PRRB ruled in the Hospital's favor on three of the four issues presented, and in the Secretary's favor on the fourth.  See Administrative Record ("AR") at 205-18 (PRRB Decision).  The Secretary, through the CMS Administrator, reversed the PRRB's decision as to the three issues decided in the Hospital's favor, and affirmed on the fourth issue decided in favor of the Secretary.  See AR at 1-40 (CMS Decision).  The Hospital now challenges the Secretary's determinations.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In a case involving review of a final agency action under the Administrative Procedure Act ("APA"), however, Rule 56(c)'s standard does not apply because of the limited role of a court in reviewing the administrative record. See North Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 79 (D.D.C. 2007). Under the APA, it is the agency's role to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. Immigration & Naturalization Serv., 753 F.2d 766, 769-70 (9th Cir. 1985). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. See Richards v. Immigration & Naturalization Serv., 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, id. § 706(2)(C), or "without observance of procedures required by law," id. § 706(2)(D). See 42 U.S.C. § 1395oo(f)(1) (courts reviewing Medicare reimbursement decisions must apply APA standards). The scope of review, however, is narrow. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A court is to presume that the agency's action is valid.

See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).  And a "court is not to substitute its judgment for that of the agency."  State Farm, 463 U.S. at 43.  But a court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting State Farm, 463 U.S. at 43).

A court reviews an agency's interpretation of a statute under the familiar two-step analysis outlined in Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837 (1984).  The first step is determining whether Congress has spoken directly to the "precise question at issue," for if it has, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43; see Nat'l Treasury Employees Union v. Fed. Labor Relations Auth., 392 F.3d 498, 500 (D.C. Cir. 2004) ("When Congress has spoken, we are bound by that pronouncement and that ends this Court's inquiry.").  If, however, the statute is silent or ambiguous on the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  The agency's interpretation of a statute "need not be the best or most natural one by grammatical or other standards . . . .  Rather [it] need be only reasonable to warrant deference."  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991) (citations omitted).

## ANALYSIS

**I.      Charity Care Patient Days**

    A.      Legal and Factual Background

The Medicaid program, 42 U.S.C. § 1396 et seq., is a cooperative venture between the

federal and state governments to help states provide medical care to certain low-income and disabled individuals.  Pursuant to Medicaid, the federal and state governments share the cost of providing medical care to eligible individuals.  See id. § 1396b.

Each state, however, administers its own Medicaid program pursuant to a state Medicaid plan, which must be approved by the Secretary of the Department of Health and Human Services.  See 42 U.S.C. §§ 1396, 1396a.  A state Medicaid plan "is a comprehensive written statement submitted by the [state] describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of" federal law.  42 C.F.R. § 430.10.  To obtain the Secretary's approval, a state's Medicaid plan must meet a number of requirements.  "The plan must," for example, "provide coverage for the 'categorically needy' and, at the State's option, may also cover the 'medically needy.'"  Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 650-51 (2003); see also 42 U.S.C. § 1396a(a)(10)(A)(i)-(ii), (C). And state Medicaid agencies must "reimburse health care providers for the cost of covered services delivered to Medicaid beneficiaries."  Ariz. Health Care Cost Containment Sys. v. McClellan, 508 F.3d 1243, 1246 (9th Cir. 2007).

If the Secretary approves the state's Medicaid plan, the state generally becomes eligible to receive federal matching funds for a statutorily-set percentage of the amount "expended . . . as medical assistance under the State plan."  See id. § 1396b(a)(1).  In distributing these federal matching funds to hospitals, states must consider "the situation of hospitals which serve a disproportionate number of low-income patients with special needs."  Id. § 1396a(a)(13)(A)(iv). Specifically, states must provide for an "appropriate increase in the rate or amount of payment for [inpatient hospital] services provided by such hospitals."  Id. § 1396r-4(a)(1).  Such adjustments

are known as "Medicaid DSH" payments, and are distinct from the <u>Medicare</u> DSH payments described above that are at issue here. States generally have flexibility in administering these Medicaid DSH payments. <u>See, e.g.</u>, <u>id.</u> § 1396r-4(b)(4), (c)(1)-(3).

Massachusetts's Medicaid program, which the Secretary has repeatedly approved, is called MassHealth. <u>See</u> AR at 52-76 (State Medicaid Plan). Generally, MassHealth pays medical providers an average payment per patient they discharge, adjusted for wage-area and other hospital-specific differences. <u>See id.</u> at 58. Consistent with its obligations under Medicaid, MassHealth also makes "a[ Medicaid DSH] payment to hospitals which qualify for such an adjustment." <u>Id.</u> at 71.

Massachusetts hospitals may qualify for a Medicaid DSH payment from MassHealth in several ways. One is through the "Uncompensated Care Disproportionate Share Adjustment," which applies to facilities that incur so-called "free care costs." <u>Id.</u> at 72; <u>see</u> 114.1 Mass. Code Regs. § 36.07(5).[2] These free care -- or "charity care" -- costs reflect the fact that, in Massachusetts, individuals whose income is less than twice the federal poverty level are eligible for free medical care, and individuals whose income is less than four times the federal poverty level are eligible for partial free care. <u>See</u> 114.6 Mass. Code Regs. § 10.03(1)-(2). Individuals are only eligible for charity care, however, if they are not enrolled in MassHealth on the day of treatment. <u>See id.</u> § 10.04.

MassHealth provides the Uncompensated Care Disproportionate Share Adjustment through the Massachusetts Uncompensated Care Pool ("UCP"). The UCP, which pays hospitals for treating charity care patients, is funded in part by federal matching funds provided to

---

[2] All citations are to the 2002 edition of the Code of Massachusetts regulations.

MassHealth. See id. § 11.04. The federal matching funds the Secretary provides to MassHealth, in turn, are based in part on the UCP's Medicaid DSH payments. See AR at 210 (PRRB Decision); February 19, 2010 Summ. J. Hr'g Tr. ("Hr'g Tr."), 5-6, 41.

Here, the Hospital received Medicaid DSH payments through the UCP for treating charity care patients for the 1999-2002 fiscal years. The fiscal intermediary concluded, however, that the Hospital's charity care patients were not "eligible for medical assistance under a state [Medicaid] plan," and thus excluded such patient days from the numerator of the Hospital's Medicaid fraction. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The PRRB reversed this determination, see AR at 210-12, but the CMS Administrator, on behalf of the Secretary, in turn reversed the PRRB and reinstated the fiscal intermediary's original ruling, see id. at 12-23.

The Hospital contends that the Secretary erred in excluding these charity care patient days from the numerator of its Medicaid fraction. For two independent reasons, the Court disagrees. The plain language of the Medicare and Medicaid statutes confirms that Massachusetts's charity care patients are not "eligible for medical assistance." Moreover, the treatment that such patients receive is not provided "under a state [Medicaid] plan."

     B.     Are Massachusetts's charity care patients "eligible for medical assistance"?

Because the Court is reviewing the Secretary's interpretation of the Medicare statute, it proceeds under the Chevron framework. The inquiry therefore starts with the statutory language. See, e.g., Carcieri v. Salazar, 129 S. Ct. 1058, 1063-64 (2009). Although the Medicare statute does not define the phrase "medical assistance," the D.C. Circuit has held that these words "ha[ve] the same meaning" in the Medicare statute "as they have in the federal Medicaid statute," which does define the phrase. Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176, 179 (D.C. Cir.

2008).

The Medicaid statute defines "medical assistance" as "'payment of part or all of the cost' of medical 'care and services' for a defined set of individuals." See id. at 180 (quoting 42 U.S.C. § 1396d(a)). This defined set of individuals, in turn, consists of patients who fall within one of thirteen categories of people to whom states may (or must) extend Medicaid benefits. See 42 U.S.C. § 1396d(a); see also id. § 1396a(a)(10)(A). For an individual to receive "medical assistance," then, he must be eligible for Medicaid under the federal Medicaid statute.

It is undisputed that the charity care patients at issue here do not come within one of those thirteen categories of people eligible for Medicaid. See Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") [Docket Entry 12], 19; Hr'g Tr. at 20.[3] Therefore, they cannot receive "medical assistance" as that phrase is defined in the Medicaid statute. See 42 U.S.C. § 1396d(a). Because "medical assistance" means the same thing in the Medicare statute as it does in the Medicaid statute, Adena, 527 F.3d at 179, these charity care patients are not, by definition, "eligible for medical assistance" as that phrase is used in the Medicare DSH statute. Therefore, the Secretary properly excluded them from the numerator of the Hospital's Medicaid fraction. See Nat'l Treasury Employees Union, 392 F.3d at 500 ("When Congress has spoken, we are bound by that pronouncement and that ends this Court's inquiry.").[4]

_____

[3] At the motions hearing, the Hospital suggested that Massachusetts's charity care patients may sometimes fall within the thirteen categories of individuals who are eligible for Medicaid. It conceded, however, that "the record here doesn't show that these [charity care] patients fit within one of those thirteen categories." Hr'g Tr. at 20.

[4] Several courts of appeals have also noted, albeit in dicta, that the numerator of the Medicaid fraction refers to patients who are eligible for Medicaid. See Cabell Huntington Hosp. Inc. v. Shalala, 101 F.3d 984, 989 (4th Cir. 1996) ("It is apparent that 'eligible for medical
(continued...)

The Hospital all but concedes that the Medicaid statute's plain language establishes that the phrase "eligible for medical assistance" means "eligible for Medicaid."  But it suggests nonetheless that following this definition would create odd results by, for example, rendering "eligible for medical assistance" a young "dot.com" millionaire who might fall into one of the thirteen categories of people eligible for Medicaid.  See Pl.'s Reply in Supp. of Mot. ("Pl.'s Reply") [Docket Entry 17], 17.  But even if true -- and such an individual's wealth would almost certainly disqualify him, see 42 U.S.C. § 1396d(a) -- strange results alone do not countermand Congress's unambiguous language.  See Sigmon Coal Co. v. Apfel, 226 F.3d 291, 308 (4th Cir. 2000), aff'd sub nom. Barnhart v. Sigmon Coal Co., 534 U.S. 438 (2002) ("[E]ven if . . . the literal text of the statute produces a result that is, arguably, somewhat anomalous -- we are not simply free to ignore unambiguous language because we can imagine a preferable version.").

The Hospital also urges the Court to evaluate Medicaid's definition of "medical assistance" in context.  It observes that this definition dates to 1965, more than twenty years before Congress adopted the provisions governing Medicaid DSH payments, and suggests that Congress intended Medicaid DSH payments to be "medical assistance."  See Hr'g Tr. at 18.  But nothing in the Medicaid DSH statute indicates that Congress intended to narrow Medicaid's definition of "medical assistance."  Indeed, the statutory context is to the contrary.  The Medicaid

_____

[4](...continued)
assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a particular state's Medicaid plan . . . ."); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1265 (9th Cir. 1996) ("We believe the language of the Medicare [DSH] provision is clear: the Medicaid [fraction] includes all patient days for which a person was eligible for Medicaid benefits, whether or not Medicaid actually paid for those days of service."); Jewish Hosp., 19 F.3d at 274 ("Facially, [the numerator of the Medicaid fraction] speaks to the aggregate number of days for which a hospital provides Medicaid eligible services.").

DSH statute offers two ways in which a hospital may be deemed a disproportionate share hospital eligible for a Medicaid DSH adjustment. One is based on the percentage of the hospital's patient days attributable to patients who are "eligible for medical assistance under a State [Medicaid] plan." <u>See</u> 42 U.S.C. § 1396r-4(b)(1)(A), (2). The other is based on the hospital's charges "attributable to charity care." <u>See</u> <u>id.</u> § 1396r-(b)(1)(B), (3). That Congress explicitly drew a distinction between patients who are "eligible for medical assistance" and those who receive "charity care" suggests that Congress was, at the very least, not narrowing the Medicaid statute's definition of who is eligible for "medical assistance" to encompass charity care patients.

Perhaps recognizing the weakness of these arguments, the Hospital focuses on a different contention. It observes that the UCP's Medicaid DSH payments to it included federal matching funds, and insists that these Medicaid DSH payments were specifically to compensate the Hospital for the cost of treating charity care patients. <u>See</u> Pl.'s Mem. at 18-20. According to the Hospital, "the Federal Medicaid statute does not authorize the Secretary to pay Federal Medicaid matching funds for anything other than expenditures by the State Medicaid program to provide 'medical assistance under the State plan.'" Pl.'s Mem. at 18 (citing 42 U.S.C. § 1396b). Therefore, in the Hospital's view, because federal matching funds paid for the treatment of the Hospital's charity care patients, the charity care patients must have received "medical assistance." Having received such "medical assistance," they were of course "eligible" for "medical assistance," and the Secretary therefore erred in excluding them from the numerator of the Hospital's Medicaid fraction.

Not so. Congress made itself clear: only patients who fall within the thirteen categories

of individuals eligible for Medicaid benefits are "eligible for medical assistance." Hence, even assuming that the federal matching funds provided through the UCP specifically pay for the treatment of the Hospital's charity care patients -- and the Secretary vehemently disputes this[5] -- those charity care patients are not rendered "eligible for medical assistance." It is Congress's unambiguous definition of "medical assistance," and not any purported inconsistent behavior by the Secretary or the Commonwealth, that controls. See <u>Am. Fed'n of Gov't Employees, AFL-CIO v. Gates</u>, 486 F.3d 1316, 1321-22 (D.C. Cir. 2007).

Because "medical assistance" is limited to patients who are eligible for Medicaid under the federal Medicaid statute, the Court need not proceed further. As the charity care patients at issue in this case do not fall within one of the thirteen categories of individuals eligible for Medicaid, the Secretary properly excluded their patient days from the numerator of the Hospital's Medicaid fraction.[6]

      C.     <u>Is the treatment that Massachusetts's charity care patients receive provided "under a state [Medicaid] plan"?</u>

Even were the Court to conclude that Massachusetts's charity care patients were "eligible

---

[5] The Secretary argues that "[t]he reimbursement to [the Hospital] pursuant to the Medicaid DSH . . . is for the medical services [it] provide[s] to, and <u>only</u> to, <u>Medicaid</u>-eligible patients, not [charity care] patients." Def.'s Mot. for Summ. J. [Docket Entry 15], 15. The Hospital contends that this would be an "absurd result." Hr'g Tr. at 22.

[6] This conclusion comports with those of the other district courts to have addressed whether charity care patients are "eligible for medical assistance." <u>See Cooper Univ. Hosp. v. Sebelius</u>, --- F. Supp. 2d ----, 2009 WL 3234625, at *7 (D.N.J. 2009) (New Jersey's charity care program "does not provide 'medical assistance' as defined in [the Medicaid statute]"); <u>Univ. of Wash. Med. Ctr. v. Sebelius</u>, --- F. Supp. 2d ----, 2009 WL 3185592, at *4 (W.D. Wash. 2009) ("Based on an analysis of the meaning of 'medical assistance' as used in the Numerator formula, the court agrees . . . that the Numerator formula is unambiguous in that it only counts patients who are eligible for Medicaid under federal statute.").

for medical assistance," it would still grant summary judgment to the Secretary because the treatment these charity care patients receive is not provided "under a State [Medicaid] plan." On this issue, the D.C. Circuit's decision in <u>Adena</u> is controlling. There, a group of Ohio hospitals argued that the Secretary improperly excluded charity care patient days from the numerator of their Medicaid fractions. Under Ohio law, hospitals were required to provide free care to indigent patients in order to be eligible for Medicaid DSH reimbursements from the state. <u>Id.</u> at 179. Because the hospitals treated these charity care patients pursuant to this state law requirement, the hospitals contended that such patients were "eligible for medical assistance under the state [Medicaid] plan."

The D.C. Circuit rejected this argument. It concluded, at <u>Chevron</u> step one, that the Ohio regulation requiring treatment of these charity care patients was "clearly not part of a 'State plan approved under [Medicaid].'" <u>Id.</u> at 178. It offered two bases for this determination. First, the Court observed that "an approved state Medicaid plan . . . must pay providers for the care of eligible patients," and Ohio's hospitals were required to treat charity care patients without payment. <u>Id.</u> Second, it concluded that Ohio's charity care patients were only eligible for such charity care "if they are not recipients of the medical assistance program, that is, Medicaid." <u>Id.</u> (internal quotation marks omitted). "It [wa]s clear," then, "that under Ohio law [charity care] patients do not receive care pursuant to the Medicaid plan and, consequently, that [charity care] patients are not eligible for care 'under a State plan approved under . . . [Medicaid]' within the meaning of the Medicare statute." <u>Id.</u> (citation omitted) (final alteration in original).[7]

_____

[7] The court also held that Ohio's charity care patients were not "eligible for medical assistance" because Medicaid's definition of "medical assistance" is "'payment of part or all of the
(continued...)

The Hospital seeks to distinguish <u>Adena</u> by arguing that, unlike Ohio's plan, MassHealth pays hospitals specifically for their costs of treating charity care patients.  But even assuming that the UCP Medicaid DSH payments specifically compensate hospitals for their treatment of charity care patients,[8] this alone does not distinguish <u>Adena</u>.  The court in <u>Adena</u> supplied two reasons for its conclusion that Ohio's charity care patients did not receive care "pursuant to the state [Medicaid] plan," but nowhere suggested that both reasons were necessary to its conclusion.  Thus, the fact that Ohio's charity care patients are not eligible for the state's Medicaid plan by itself established that those patients "do not receive care pursuant to the [state] Medicaid plan."  As Massachusetts's charity care patients are not eligible for MassHealth, then, they also do not receive care pursuant to the state Medicaid plan.

The Hospital also observes that MassHealth expressly provides for the UCP to pay hospitals that treated charity care patients.  <u>See</u> Pl.'s Reply at 3.  Thus, it contends, the charity care patients' treatment must have been provided pursuant to MassHealth, the state Medicaid plan.  But <u>Adena</u> rejected a similar argument.  There, the Secretary had "approved certain modifications" to Ohio's charity care regulation "as an amendment to Ohio's Medicaid plan."

---

[7](...continued)
cost' of medical 'care and services,'" and Ohio's charity care regulation "does not entail any payment."  <u>Id.</u> at 179-80 (quoting 42 U.S.C. § 1396d(a)).  This holding is inapplicable to the Court's earlier discussion of "medical assistance," however, because Massachusetts hospitals receive payment for treating charity care patients.

[8] As indicated above, the Court need not resolve the disputed question of whether these UCP payments are made solely to compensate hospitals for the treatment of charity care patients, or whether they are instead payments for the treatment of other Medicaid patients.  <u>See</u> <u>Adena</u>, 527 F.3d at 179 n.** ("Hospitals in Ohio receive more DSH funds under the Medicaid plan the more [charity care] patients they treat not because those patients receive care under the Medicaid plan, but because Ohio law treats such patients as a proxy for low-income patients, just as the Medicare provision treats Medicaid patients as a proxy for low-income patients.").

Adena, 527 F.3d at 178-79. Thus, the hospitals argued, "the regulation must be part of the Ohio Medicaid plan: Why else would the Secretary have approved the regulation as an amendment to that plan?" Id. at 179.

The Adena court quickly dismissed this argument. It observed that Ohio was permitted "to determine DSH adjustments in its Medicaid program by reference to a hospital's compliance with the requirement . . . that a hospital provide charity care." Id. at 179. Having done so, Ohio was obligated "to submit the regulation to the Secretary for approval because the mechanism for providing a DSH adjustment under Medicaid is part of Ohio's Medicaid plan, and the Secretary must approve that plan." Id. But, the Court concluded, "[t]he Secretary's approval of [Ohio's charity care program] does not suggest in any way that [the charity care] patients receive care pursuant to the Ohio Medicaid plan." Id. So too here: the Secretary's approval of Massachusetts's charity care program does not mean that Massachusetts's charity care patients receive treatment pursuant to MassHealth.

At the motions hearing, the Hospital offered that the UCP program is incorporated to a far greater extent in MassHealth than Ohio's charity care program was in Ohio's state Medicaid plan. See Hr'g Tr. at 11-13. But the Adena court gave no indication that its conclusion -- that the Secretary's approval of Ohio's plan was irrelevant -- turned on the extent to which Ohio's Medicaid plan described or incorporated its charity care program. And this Court declines to adopt a rule whereby the nature of the treatment given to a state's charity care patients depends on the description of the program offered in the state Medicaid plan.

Even assuming that Massachusetts's charity care patients are "eligible for medical assistance," then, they still do not receive care "under a state [Medicaid] plan." Hence, the

Secretary properly excluded charity care patient days from the numerator of the Hospital's

Medicaid fraction for this reason as well.

## II.    Medicare+Choice Patient Days

The second issue concerns whether patient days attributable to individuals who have

enrolled in "Medicare+Choice" plans should be included in the numerator of the Medicaid

fraction. The Medicare program is divided into several parts, of which two -- parts A and C --

are relevant here. Medicare part A covers medical services furnished to beneficiaries by

hospitals and other institutional care providers. See 42 U.S.C. §§ 1395c to 1395i-5. And

Medicare part C -- sometimes called Medicare+Choice -- allows beneficiaries to obtain medical

services through HMOs, preferred provider organization plans, and other "managed care"

arrangements offered by private health insurers. See 42 U.S.C. §§ 1395w-21 to 1395w-28.

Individuals are eligible for Medicare part C if they are "entitled to benefits under [Medicare] part

A." 42 U.S.C. § 1395w-21(a)(3)(A) ("[T]he term 'Medicare + Choice eligible individual' means

an individual who is entitled to benefits under [Medicare] part A . . . ."). Individuals eligible for

Medicare part C may elect to receive their Medicare benefits either "through the original

medicare fee-for-service program under [Medicare] parts A and B . . . , or . . . through enrollment

in a Medicare+Choice plan under [Medicare part C]." 42 U.S.C. § 1395w-21(a)(1).

Here, the fiscal intermediary calculating the Hospital's Medicare DSH reimbursement

excluded from the numerator of the Medicaid fraction the Hospital's patient days attributable to

individuals who had elected a Medicare+Choice ("M+C") plan under Medicare part C, and who

were eligible for Medicaid, because such patients were still "entitled to benefits under [Medicare]

part A."  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).[9]  The PRRB affirmed this determination, see

AR at 207-10, and the Secretary in turn affirmed the PRRB, see id. 9-11.

The precise question before the Court is whether patients who elect to receive their

Medicare benefits through a M+C plan under Medicare part C are still "entitled to benefits under

[Medicare] part A."  The Secretary contends that because individuals may only enroll in a M+C

plan if they are "entitled to benefits under [Medicare] part A," 42 U.S.C. § 1395w-21(a)(3)(A),

the Hospital's M+C patients were necessarily "entitled to benefits under [Medicare] part A."  The

Secretary insists she therefore properly excluded such patient days from the numerator of the

Hospital's Medicaid fraction.

This argument fails, however, because it ignores the statutory definition of "entitled to

benefits under [Medicare] part A."  Under the Medicare statute, "entitlement of an individual to

[Medicare part A] benefits for a month shall consist of entitlement to have payment made under,

and subject to the limitations in, [Medicare] part A . . . on his behalf for [certain] services."  Id. §

426(c)(1).[10]  As the Secretary notes, a person may only enroll in a M+C plan if he is entitled to

_____

[9] As detailed above, the numerator of the Medicaid fraction "consist[s] of patients who
(for such [patient] days) were eligible for medical assistance under a State [Medicaid] plan . . . ,
but who were not entitled to benefits under [Medicare] part A."  Id.

[10] The Medicare statute also states that "[t]he benefits provided to an individual by the
insurance program under [Medicare part A] shall consist of entitlement to have payment made on
his behalf" for certain medical services.  42 U.S.C. § 1395d(a).  Both § 1395d and § 426 were
adopted with the original Medicare bill.  See 42 U.S.C. § 1395d(a) (1965); id. § 426(b)(1) (1965)
(same as present 42 U.S.C. § 426(c)(1)).  The linguistic distinctions between the two provisions
are irrelevant here, however: section 1395d(a) details that individuals receiving Medicare part A
benefits are entitled to have payments made on their behalf, and section 426(c)(1) clarifies that
these payments are "made under, and subject to the limitations in, [Medicare] part A."
Moreover, to the extent that both provisions define "entitled to benefits under [Medicare] part
A," the Court must still apply § 426(c)(1)'s more specific language in order to give meaning to all
(continued...)

-18-

benefits under Medicare part A.  See id. § 1395w-21(a)(3)(A).  Once that individual enrolls in a M+C plan, however, he is no longer "entitle[d] to have payments made under, and subject to the limitations in, [Medicare] part A."  Rather, "payments under a contract with a Medicare+Choice organization . . . with respect to an individual electing a Medicare+Choice plan offered by the organization shall be instead of the amounts which (in the absence of the contract) would otherwise be payable under [Medicare] parts A and B."  Id. § 1395w-21(i)(1) (emphases added); see also id. § 1395w-21(a)(1) ("Each [M+C] eligible individual . . . is entitled to receive benefits . . . (A) through the original medicare fee-for-service program under parts A and B . . . , or (B) through enrollment in a Medicare+Choice plan under [part C]." (emphasis added)).  In other words, once an individual elects a M+C plan, payments on his behalf during that enrollment are no longer made under Medicare part A, but are instead made under Medicare part C.[11]

Congress, then, explicitly concluded that M+C patients are not "entitled to benefits under [Medicare] part A" as that phrase is defined in the Medicaid statute.  Hence, the Secretary erred by excluding patient days attributable to such individuals from the numerator of the Hospital's

_____

[10](...continued)
of Congress's words.  See Hawaii v. Office of Hawaiian Affairs, 129 S. Ct. 1436, 1444 (2009) ("We must have regard to all the words used by Congress, and as far as possible give effect to them.").

[11] The Secretary does not address 42 U.S.C. § 1395w-21(i)(1) in her briefs.  At the motions hearing, however, she observed that this section is "[s]ubject to" a number of other provisions.  See Hr'g Tr. 52-54; see also 42 U.S.C. § 1395w-21(i)(1) (listing 42 U.S.C. §§ 1395w-22(a)(5), 1395w-23(a)(4), (g), (h), (m), 1395ww(d)(11), (h)(3)(D)).  The Court agrees.  Therefore, § 1395w-21(i)(1) does not apply, for example, when there are certain "legislative change[s] in benefits."  See 42 U.S.C. § 1395w-22(a)(5).  But the Court need not address how these exceptions to § 1395w-21(i)(1) affect M+C enrollees' entitlement to benefits under Medicare part A, as the Secretary has not suggested that these exceptions apply to the Hospital's M+C patients at issue here.

Medicaid fraction.

Moreover, the Secretary's conclusion that M+C patients remain "entitled to benefits under [Medicare] part A" directly conflicts with her interpretation of identical language elsewhere in the Medicare statute. Thus, even if the Medicare DSH statute were ambiguous, the Court would still, at <u>Chevron</u> step two, vacate the Secretary's final decision and remand for further proceedings.

42 U.S.C. § 1395ww(d)(5)(G), located immediately adjacent to the provision governing the Medicare DSH adjustment at issue in this case -- 42 U.S.C. § 1395ww(d)(5)(F) -- provides for Medicare DSH adjustments to "medicare-dependent, small rural hospital[s]." Whether a hospital is a "medicare-dependent, small rural hospital" depends on how many of the hospital's patient days are attributable to patients "entitled to benefits under [Medicare] part A." <u>Id.</u> § 1395ww(d)(5)(G)(iv)(IV).

In a 1990 final rule, the Secretary interpreted this section such that individuals are "entitled to benefits under [Medicare] part A" only when they are entitled to have their medical services paid for under Medicare part A. Specifically, she observed that "[e]ntitlement to payment under part A ceases after the beneficiary has used 90 days in a benefit period and has either exhausted the lifetime reserve days or elected not to use available lifetime reserve days." 55 Fed. Reg. 35990, 35996 (Sept. 4, 1990).[12] But "[s]ince patients who have exhausted their part A benefits are no longer entitled to payment under part A," she concluded, "we do not believe

---

[12] As explained by the Secretary, "[t]he scope of benefits to which an individual is entitled to payment under part A . . . [is] limited to 90 days during each benefit period. An additional lifetime reserve of 60 days may be drawn upon when an individual exceeds 90 days in a benefit period." <u>Id.</u>

such stays should be counted" in this Medicare DSH calculation.  Id.

Were the Secretary's prior interpretation applied to the Medicare DSH provision at issue here, the Hospital's M+C patient days would be included in the numerator of the Medicaid fraction, as such patients are "no longer entitled to payment under [Medicare] part A."  Indeed, the agency "acknowledges that this reasoning [in the 1990 final rule] is inconsistent with the Secretary's interpretation of the term 'entitlement' in the Medicare DSH calculation."  Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") [Docket Entry 24], 18.  Nevertheless, the Secretary insists that this inconsistency "does not mean that the Secretary's interpretation of the Medicare DSH statute is either incorrect or arbitrary."  Id.  Indeed, "[i]t may be that the interpretation of 42 U.S.C. § 1395ww(d)(5)(G)(iv)(IV) should be amended to conform to the Secretary's interpretation of the Medicare DSH statute, or that, due to different statutory purposes, it is reasonable for the Secretary to interpret the same statutory language differently."  Id. at 18-19.

Perhaps.  "There is . . . no effectively irrebuttable presumption that the same defined term in different provisions of the same statute must be interpreted identically."  Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 576-77 (2007) (internal quotation marks omitted).  Rather, "the 'natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.'"  Id. (quoting Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)).  But the Secretary has, she concedes, offered no explanation or argument for why Congress might have employed this identical language, in

adjacent paragraphs, with different intent.  See Hr'g Tr. at 61 ("Q: But in either instance, the Secretary hasn't explained it.  A: That is correct.  Q: And hasn't really articulated that position.  A: That is correct.").

Therefore, even if the statute were ambiguous, the Secretary's decision would still be arbitrary and capricious for this reason.  "Of course the mere fact that an agency interpretation contradicts a prior agency position is not fatal."  Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996).  But agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."  Fed. Commc'ns Comm. v. Fox TV Stations, Inc., 129 S. Ct. 1800, 1811 (2009); accord Dillmon v. Nat'l Trans. Safety Bd., 588 F.3d 1085, 1089 (D.C. Cir. 2009) ("Reasoned decision making, therefore, necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent." (citing Fox TV, 129 S. Ct. at 1811)).  Here, the Secretary has offered no explanation, much less a reasoned one, for her departure from her earlier interpretation of the phrase "entitled to benefits under [Medicare] part A."  Accordingly, even at Chevron step two, the Court would still vacate the Secretary's final decision and remand for further proceedings.  See Dillmon, 588 F.3d at 1095 ("[B]ecause the Board departed from its precedent without reasoned explanation, we grant the petition for review, vacate the order, and remand for further proceedings.").

## III.    Labor and Delivery Patient Days

The Hospital also contends that the Secretary erred in excluding from the numerator of its Medicaid fraction the days associated with labor and delivery services that are attributable to patients who are eligible for Medicaid and not entitled to Medicare part A benefits.  The fiscal intermediary concluded that these days are not "patient days," as required by the Medicaid

fraction, and thus excluded them. The PRRB reversed this determination, see AR at 212-16, but the Secretary then reversed the PRRB, see id. at 24-34.

The Secretary has interpreted "patient days" to refer to "only those days attributable to areas of the hospital that are subject to the prospective payment system." 42 C.F.R. § 412.106(a)(1)(ii) (2002). The prospective payment system -- which provides hospital reimbursements based on prospectively-determined standardized rates -- applies to the "operating costs of inpatient hospital services." 42 U.S.C. § 1395ww(d)(1)(A). "[T]he term 'operating costs of inpatient hospital services'" is further defined as "includ[ing] all routine operating costs, ancillary service operating costs, and special care unit operating costs with respect to inpatient hospital services." Id. § 1395ww(a)(4).

The Secretary now concedes that her decision to exclude these days from the numerator of the Hospital's Medicaid fraction "was premised on the erroneous belief that costs attributable to labor and delivery room patients were not treated as inpatient operating expenses." Def.'s Reply at 19; see also Hr'g Tr. at 64 ("As we freely concede, the administrator's decision in the labor and delivery room day issue was wrong."). Accordingly, she asks the Court to remand the issue to the agency for further proceedings. See Def.'s Reply at 19. The Hospital objects, and instead requests an order "declaring invalid, and setting aside, the Deputy Administrator's decision . . . and further directing the Secretary to count labor and delivery room days in both the numerator and denominator of the Medicaid fraction." Pl.'s Reply at 42.

The Court cannot grant the Hospital's request. The rule in this circuit is clear: "'when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the

correct legal standards.'" Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (quoting County of Los Angeles, 192 F.3d at 1011); see also Baystate Med. Ctr. v. Leavitt, 545 F. Supp. 2d 20, 58 (D.D.C. 2008) ("A district court may not 'retain jurisdiction to devise a specific remedy for the Secretary to follow.'" (quoting County of Los Angeles, 192 F.3d at 1011)). Accordingly, the Court "ha[s] jurisdiction only to vacate the Secretary's decision . . . and to remand for further action consistent with its opinion," and it would be error to do anything more. Palisades, 426 F.3d at 403.

## IV. The Medicare Fraction

The Hospital's final contention is that the Secretary's own data cannot support her calculation of the Hospital's Medicare fraction for fiscal year 1999. The Secretary acknowledges that this case "presents the same allegations of systematic flaws of the [Medicare] fraction that this Court decided in Baystate," 545 F. Supp. 2d 20. Def.'s Mot. at 42. Accordingly, she "concedes that this Court has no reason to enter a different decision in this case." Id. at 42-43. The Court will thus vacate the Secretary's final decision and remand for further proceedings. See Palisades, 426 F.3d at 403.[13]

The Hospital further asks that, beyond a remand, the Court also "enjoin the Secretary and her subordinates from continuing to disregard the Court's [Baystate decision]." Pl.'s Reply at 43. Citing the Secretary's final decision in this case, the Hospital complains that "the Secretary apparently refuses to acquiesce in this Court's [Baystate] ruling," but instead "intends to force the Plaintiff Hospital . . . to go through the same meaningless, lengthy, and expensive hearing

---

[13] The Hospital urges the Court to issue specific guidance to the Secretary on remand. For the reasons already explained, the Court cannot do so.

process only to eventually arrive in this Court, where the Secretary will then concede error and seek a remand." Id. at 43-44.

As the agency notes, however, "the Deputy Administrator decided this case before the Secretary withdrew her appeal of the Court's decision in Baystate." Def.'s Reply at 20.[14] And the Secretary's counsel represented at the motions hearing that, to his knowledge, "there have been no decisions subsequent to the withdrawal of the appeal in Baystate[] where the [CMS] administrator has addressed whether Baystate should be followed in the administrative context." Hr'g Tr. at 66. Indeed, even the Hospital acknowledged that it "d[idn't] think the Secretary has issued a decision on that one way or another since [Baystate]." Id. at 37. Even assuming that this Court has the authority to "enjoin the Secretary" in the manner requested by the Hospital, then, nothing in the record suggests that such an aggressive approach is warranted at this time.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the parties' cross-motions for summary judgment, will vacate the Secretary's final decision, and will remand this matter to the Secretary for further proceedings consistent with this opinion. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Date: March 30, 2010

---

[14] The Secretary's final decision in this case is dated November 21, 2008. See AR at 40. The Secretary withdrew her appeal in Baystate in February 2009. See Clerk's Order, Baystate Med. Ctr. v. Johnson, No. 09-5039 (D.C. Cir. Feb. 26, 2009).